IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

MYRIAM A. GALARZA,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

---

Civil Action No. 08-5268 (PGS)

OPINION

Plaintiff Myriam A. Galarza appeals the Commissioner of Social Security's denial of her disability benefits. Plaintiff filed an application for disability insurance benefits on April 8, 2004 alleging disability beginning April 30, 2001 due to a back injury, high blood pressure, depression, and restlessness. (R. 143, 145). Plaintiff's application was initially denied by a June 30, 2006 decision by the Honorable Michal Lissek, an Administrative Law Judge ("ALJ"); but on February 23, 2007 the Appeals Counsel of the Social Security Administration vacated that decision, and remanded the case for further proceedings. On remand, the ALJ found Plaintiff disabled as of April 22, 2004, and has remained disabled since that date. The issue on appeal is whether Plaintiff was disabled from April 30, 2001 through February 27, 2004 due to a "severe" psychiatric impairment[1].

I.

Plaintiff is a 59 year old woman born in Puerto Rico. She immigrated to the United States

---

[1] The Commissioner of Social Security concedes that Plaintiff's disability began on February 27, 2004, the day her husband died, rather than April 22, 2004 as ALJ Lissek determined. Per the Commissioner's request, the date of disability will be revised to February 27, 2004.

1

when she was 18 years old. (R. 234). Plaintiff is a high school graduate with no special job training or education. (R. 149). Presently, she lives in Perth Amboy, New Jersey in an apartment with her son. Her husband died on February 27, 2004. (R. 139). According to the April, 2004 Adult Disability Report, Plaintiff alleges that she is unable to work after she was injured in a car accident on May 20, 2000. Since that day she has had sharp acute pain in her lower back and head. The pain throbs down her back and into her shoulder. Her lower back pain is exacerbated by standing or sitting too long. She stated that she could not sit or stand for more than 2 hours.

Plaintiff worked as a sewing machine operator for Schott Brothers, Inc. from 1989 through 2001 where she sewed various items (buttons and zippers) onto coats. The heaviest weight Plaintiff frequently lifted was 10 pounds. Her job required her to walk 2 hours, sit 8 hours, stoop and crouch, and to maneuver coats for 8 to 10 hours per day. After the auto accident, Plaintiff could not work due to pain.

At present, Plaintiff described her typical day as getting up, making coffee, and sitting for a while before dusting. After dusting, she then sits awhile and then cooks dinner. Plaintiff complained that dinner preparation takes a longer period since she must sit to quell the pain. (R. 191). She cooks about once a day, cleans, vacuums, and washes dishes, but cannot lift heavy items or move her shoulder too many times. (R. 192). She can walk about 2 blocks before stopping to rest for a brief period (15 - 20 minutes). In a headache questionnaire dated August, 2004, Plaintiff complained that her headaches occur almost every day, and persist from a few hours to a few days. (R. 195). The headaches cause nauseousness and are exacerbated by light and noise. She takes Advil or a prescription medication for the pain. As of August 2004, Plaintiff's medications included Diovan HCT, Paxil, Ambien Celebrex, Advil, and Coreg Myoflex. (R. 226).

At the March 2, 2006 administrative hearing, Plaintiff testified that she was injured in an automobile accident in 2000 and stopped working a year later due to pain (R. 391-92). She further testified that she had been receiving psychiatric therapy once a week since sometime in 2005 (R. 395-96). Finally, Plaintiff testified that she sometimes does household chores but rarely leaves her home. (R. 397).

At the July 25, 2007 hearing, Plaintiff testified that her conditions had worsened since the 2006 hearing, and she had begun to use a cane during the last couple of months. (R. 408). Her physical impairments and headaches have become more painful and continuous, and her psychiatric condition had worsened since her husband passed away. (R. 409-10, 413).

Progress Notes from Treating Physicians

On August 30, 2000, Plaintiff was treated by Steven Lomazow, M.D, a neurologist. On exam, Plaintiff had bilateral paraspinal cervical and upper trapezious spasm and exquisite tenderness in left and right trapezii. There was pain in the range of motion of Plaintiff's left shoulder. She was also diagnosed with persistent cervical complaints, probable internal derangement of the left shoulder and post traumatic headaches, cericogenic in nature. (R. 279-280).

On November 6, 2000 Plaintiff was seen by Gregory P. Charko, M.D., of Orthopedic Physicians and Surgeons. At the time of the examination, she complained of pain in her neck and left shoulder radiating down into her elbow resulting from the motor vehicle accident. Dr. Charko reported that Plaintiff walked with a normal gait, was neurologically intact with normal sensation and reflexes in the arms, had intact strength in her forearms and hands, with only somewhat limited motion in her cervical spine and left shoulder (R. 282). It was Dr. Charko's opinion that Plaintiff had a cervical sprain with cervical radiculits and left shoulder sprain with impingement and partial

rotator cuff injury.

On February 22, 2001, John W. King, an orthopedic physician opined that Plaintiff was suffering from a herniated disc in her neck at C5/6 on the right. She was referred to physical therapy for marcaine injections and for MRI of spine. (R 284).

Diagnostic Tests

A December 15, 2000 MRI indicated a C5-6 herniation in Plaintiff's neck with diffuse disc bulging with uncinate process and facet hypertrophy. (R. 286).

A February 4, 2000 CT scan of her head was normal. (R. 224).

A March 2001 lumbar spine MRI showed no herniations and was unremarkable other than degenerative disc disease and bulges at the L3-4 and L4-5. A shoulder MRI of the same date found "mild acromioclavicular joint related rotator cuff impingement. " (R. 283).

Cardiologist Notes

From July 14, 1999 forward, there are considerable progress notes from physicians at Associates in Cardiology ("AIC"). On the above date, Plaintiff reported irritation in both eyes and occasional headaches, and the doctor diagnosed conjunctivitis and hypertension (R. 212). Plaintiff was seen for a check-up on August 5, 1999, and on December 29, 1999 she complained of an intermittent headache for three or four days and accompanied by occasional nausea. (R. 210-11). The AIC doctor noted that there were no focal neurological deficits, and he diagnosed hypertension and tension related headaches. (R. 210). On April 5, 2000, Plaintiff reported that she was feeling better but still had occasional headaches (R. 208). On May 13, 2000, AIC changed her diagnosis to hypertension and anxiety (R. 207). On November 28, 2000, Plaintiff was treated for redness in her left eye (R. 205). On February 1, 2002, AIC reported that Plaintiff was stable, but she discontinued

her blood pressure medication and was complaining of occasional chest discomfort (R. 204). Her blood pressure medication was restarted, and her condition remained stable until October 23, 2002. On that date, Plaintiff treated with Dr. Ravinda Patel, and she complained of chest pain radiating to the back for the past week (R. 219). An electrocardiogram ("EKG") showed sinus tachycardia, normal axis, and left atrial abnormalities (R. 220, 221). Dr. Patel assessed a new onset of chest pain that was not coronary artery disease; but might be either peptic ulcer disease or controlled hypertension. (R. 220). Dr. Patel also diagnosed sinus tachycardia noting that Plaintiff was nervous possibly because of hyperthyroidism or another metabolic disorder. To confirm her diagnosis, the doctor advised further testing. (R. 220). On November 13, 2002 AIC indicated Plaintiff felt better and had no new complaints. (R. 200-A).

There is little or no evidence of ongoing medical treatment in 2003 and 2004. There is no psychiatric treatment between 2001 through 2004, and only two minor references to emotional concerns. These concerns were on May 13, 2000 when her cardiologist observed that she was nervous, and on October 23, 2002 when another cardiologist noted that Plaintiff had an elevated heartbeat and appeared nervous. (R. 207, 220). Both of these notes are isolated amid other reports that make no findings of emotional issues.

Treating Psychologist Notes

Plaintiff's lack of psychiatric treatment prior to 2004 is radically different than Plaintiff's treatment after the death of her husband. On April 22, 2004 Plaintiff was seen by Dr. Arancibia, a psychologist who noted that she had been feeling depressed since her husband's death. (R. 346). In July 2004, Dr. Nadipuram reported that Plaintiff had been depressed, unable to sleep and focus, had poor motivation and a loss of appetite since her husband's death. (R. 343). In August 2004, the

5

doctor reported that Plaintiff was feeling guilty about her husband's death and her depression had been exacerbated when her brother-in-law visited for a week. (R. 325). In October 2004, Dr. Nadipuram reported that Plaintiff was grieving her husband's death, was having nightmares related to his death, and was nervous about to traveling to Puerto Rico which could revive memories of her husband and further worsen her depression. (R. 326-27). Dr. Nadipuram found depression and emotional problems relating to Plaintiff's husband's death for the next two years.

Consultating Physician Reports

On August 3, 2004, Plaintiff was seen by Ronald Bagner, M.D. for a consultative internal medicine evaluation. Plaintiff complained of lower back pain which radiates down into the right leg, She also complained of pain in the left shoulder, left upper arm and dorsal region of the back, probably due to the motor vehicle accident in 2000. She reported having an MRI but the results were not available. She stated that she needs to constantly change positions due to the pain. She was hypertensive with blood pressure of 130/84. At the exam, she ambulated slowly and gets on and off the examining table with no difficulty, and dressed and undressed without assistance. She was not uncomfortable sitting during the interview, did not use a cane or crutches, and could walk heel to toe. There was normal flexion of the cervical spine. (R. 227). The diagnosis was lumbar radiculopathy. X-rays of the lumbrosacral spine, right shoulder and left shoulder taken at that time were normal. (R. 229).

On August 5, 2004 Plaintiff was seen by Joseph Buceta, M.D. of Central Jersey Medical Evaluations. (R. 232). Her chief complaint was that she has high blood pressure, and back pain since the car accident. According to Plaintiff, she had physical therapy sessions three times a week initially, which were later reduced to once a week. (R. 233). Plaintiff reported that she began

6

suffering depression after the death of her husband and had seen a psychiatrist who prescribed antidepressants. (R. 233). Her appetite was fair and her sleep pattern was poor. She denied suicidal or homicidal ideation. She denied feelings of worthlessness or haplessness, and there were no signs of psychomotor agitation or aggravation. During the mental status examination, Plaintiff was cooperative, and her speech was coherent and goal directed. She was mildly depressed at the time of the examination because she felt guilty that her husband died and that she did not take care of him. Dr. Buceta diagnosed her with depressive disorder, hypertension, back pain. her Global Assessment of Functioning ("GAF") was 65[2], and her psychiatric prognosis was fair. (R. 235).

On September 9, 2004, Dr. Amy Brenner, a state agency reviewing psychiatrist, reviewed the medical records in this case and filled out a mental RFC assessment as well as a psychiatric review technique form ("PRTF") (R. 238-41, 243-56). A second state agency review psychiatrist, Dr. Sury Putcha, reviewed the records and corroborated Dr. Brenner's opinions on January 18, 2005. (R. 240, 243). Dr. Brenner opined that Plaintiff had moderate limitations in activities of daily living, maintaining social functioning, and in maintaining concentration, persistence, or pace. (R. 253). Plaintiff had never had an episode of decompensation for an extended period and had no impairment that met or equaled a Listing. (R. 243-44). On the mental RFC form, Dr. Brenner found Plaintiff with marked limitations in her ability to understand, remember, and carry out detailed instructions. (R. 238). While the doctor also found Plaintiff moderately limited in some

---

[2] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. A GAF between 61–70 indicates some mild symptoms OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.

areas of sustained concentration and persistence, social interaction, and adaptation, she concluded that Plaintiff could to follow simple instructions, attend and concentrate, keep adequate pace and persist, and relate and adapt to routine tasks in a work situation. (R. 238-40).

On May 7, 2007, Dr. Pradip Gupta, a psychiatrist, examined Plaintiff at the Commissioner's request. (R. 290-95). Plaintiff reported symptoms of depression for several years starting after the automobile accident. (R. 290). The doctor's mental status examination showed that Plaintiff could engage in a logical and coherent conversation with diminished speech output (R. 291). She could adequately follow three step commands, had a fair fund of general knowledge and information, below average abstracts and reasoning. She also had fair ability to do arithmetic and calculations, but was unable to do serial threes, fours, or sevens. (R. 291). Plaintiff appeared moderately depressed with a flattened affect. (R. 291). She was able to keep good eye contact with the interviewer, had no active psychosis, no mania or hypomania, no suicidal thoughts, fair impulse control, non-goal directed thought processes, and somatic concern and preoccupation regarding pain. (R. 291). The doctor diagnosed Plaintiff with chronic depressive disorder, most likely secondary to chronic pain syndrome, and assessed her GAF at 55[3]. (R. 291).

Review of ALJ by District Court

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. See *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). 42 U.S.C. §405(g); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such

---

[3] A GAF between 51–60 indicates moderate symptoms OR any moderate difficulty in social, occupational, or school functioning.

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. The ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 n.9 (3d Cir. 2009) (internal quotations omitted).

The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - - particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sec'y of Health and Human Servs.*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating that the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder."). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently."

9

*Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act (42 U.S.C. §401, *et seq.*) requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability. *See* 42 U.S.C. §423(d)(5)(a). Therefore, claimant must prove that his or her impairment is medically determinable and cannot be deemed disabled merely by subjective complaints such as pain. A claimant's symptoms "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . .[one's] ability to do basic work activities unless "medical signs" or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. §404.1529(b). *Hartranft*, 181 F.3d at 362. In *Hartranft*, claimant's argument that an ALJ failed to consider his subjective findings were rejected where the ALJ made findings that claimant's claims of pain and other subjective symptoms were not consistent with the objective medical records found in the record or the claimant's own hearing testimony.

Reading the record as a whole, the Plaintiff endured two incidents which led to her disability. They are a car accident in 2000, and the death of her husband in 2004. The car accident caused pain in her back and head which is substantiated by objective medical evidence, and she stopped work some time in 2001 or 2002. There is little or no evidence from the time of the car accident to the time of her husband's death (2004) of any psychiatric impairment. Plaintiff's legal brief, however, attempts to change the clear facts of this case. Plaintiff's attorney states that Plaintiff's treating physicians "suggest . . . her psychiatric impairment was both chronic and existed prior to April

10

2004." There is no evidence to support same.   The Plaintiff latches onto a October 23, 2002 report which only mentions "anxiety" as a single word without any analysis and couples it with a report dated April 2, 2004 to allege proof of a psychiatric impairment from 2001 forward.  The reports are substantially different due to the intervening death of her husband in  February, 2004. Moreover, there is neither any ongoing psychiatric treatment from 2001- 2004, nor developed support of same. There are no antidepressant drugs prescribed, and there is no hospital treatment.  Accordingly, the Commissioner correctly concluded that the injuries sustained in the car accident plus those psychiatric injuries occurring from the death of the husband (February 27, 2004) combined led to a finding of disability.

       The decision of the ALJ is affirmed.  Plaintiff's complaint is dismissed with prejudice.


                               *s/Peter G. Sheridan*
                               PETER G. SHERIDAN, U.S.D.J.

January 25, 2010